IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| CHERYL L. WATKINS, | ) | Civil No.  07-6185-JE |
| | ) | |
| Plaintiff, | ) | FINDINGS AND |
| | ) | RECOMMENDATION |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner, | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Kathryn Tassinari
Brent Wells
Harder, Wells, Baron & Manning, P.C.
474 Willamette, Suite 200
Eugene, OR 97401
        Attorneys for Plaintiff

Karin J. Immergut
U.S. Attorney
Britannia I. Hobbs
Asst. U.S. Attorney
1000 S. W. 3rd Avenue, Suite 600
Portland, OR 97204-2902
Leisa A. Wolf

FINDINGS AND RECOMMENDATION - 1

Special Assistant U.S. Attorney
Office of the General Counsel
Social Security Administration
701 5th Avenue, Suite 2900 M/S 901
Seattle, WA 98104-7075
            Attorneys for Defendant

JELDERKS, Magistrate Judge:

Plaintiff Cheryl Watkins brings this action pursuant to §§ 205(g) and 1631 of the

Social Security Act, as amended, 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial

review of a final decision of the Commissioner of Social Security (the Commissioner)

denying her applications for Disability Insurance Benefits (DIB) and Supplemental Security

Income (SSI).  The decision of the Commissioner should be reversed, and this action should

be remanded for further proceedings as set out below.


### Procedural Background

Plaintiff filed applications for DIB and SSI on July 23, 2004, alleging that she had

been disabled since October 9, 1997, because of an anular tear in her spine that impaired her

mobility and caused pain from her neck to her toes.  Plaintiff's applications were denied

initially on December 3, 2003, and upon reconsideration on March 23, 2004.

Based upon plaintiff's timely request, a hearing was held before Administrative Law

Judge (ALJ) Marilyn Mauer on April 27, 2006.  In an opinion filed on September 6, 2006,

ALJ Mauer found that plaintiff was not disabled within the meaning of the Social Security

Act.  That decision became the final decision of the Commissioner on May 25, 2007, when

the Appeals Council denied plaintiff's request for review.  In the present action, plaintiff

challenges that decision.


FINDINGS AND RECOMMENDATION - 2

**Factual Background**

Plaintiff was born on December 1, 1951.  She was 45 years old at the time of the alleged onset of her disability, and was 54 years old at the time of the hearing before the ALJ.  Plaintiff obtained a GED during the 1980's, and worked as an electronics assembler from 1991 until the date of the alleged onset of her disability in 1997.  Plaintiff was injured in an automobile accident on October 9, 1997, and has not worked full time since that date.  She has done some part-time work assisting her husband with his consulting business since the accident.

**Medical Background**

Plaintiff sought medical treatment for back pain at an emergency room after she was involved in a motor vehicle accident on October 9, 1997.  She was diagnosed with neck and lumbar muscle strain, and was treated with ice and Tylenol.  The treating physician reported that the vehicle in which plaintiff had been a passenger had been traveling at approximately 10 miles per hour when it was struck on the passenger side by another vehicle traveling at approximately 12 miles per hour.

Following the accident, plaintiff began treating with Dr. Rodney Holland, a chiropractor, who gave plaintiff chiropractic adjustments twice a week.  Dr. Holland observed that plaintiff's symptoms were consistent with a diagnosis of cervical, thoracic, and SI strain/sprain with attendant subluxations, and opined that she was "progressing slowly but steadily," and was "80-90% improved" by January 27, 1998.

On March 24, 1998, plaintiff reported that she was experiencing cervical and thoracic pain, and that pain occasionally radiated into her hip.  Plaintiff reported that she noticed a

burning pain in her back and neck with increased activity.  Dr. Holland opined that plaintiff was 90% improved, and asked plaintiff to return every two weeks.  On March 31, 1998, plaintiff told Dr. Holland that she was experiencing thoracic and lumborsacral soreness and hypesthesia of her hands and arms.  She said she had been doing more physical activities "without major pain patterns," and Dr. Holland indicated that he expected to release her for light work at her next appointment in two weeks.

On April 20, 1998, plaintiff told Dr. Holland that she was experiencing upper thoracic pain, cervical discomfort, and dizziness that made walking difficult.  On April 28, 1998, plaintiff reported that sitting at a computer caused neck pain and a burning sensation.  She said that, after attempting to lift 10 pounds, she was in pain the next day.  Dr. Holland opined that plaintiff was unable to return to normal employment at that time "without degrading her progress and causing excessive pain."

On May 26, 1998, plaintiff told Dr. Holland that she experienced constant lumbosacral, thoracic, and cervical pain, which was aggravated by activity.  Dr. Holland opined that plaintiff's progress was affected by stress and chronicity, and encouraged plaintiff to "investigate a light form of work schedule."

On June 16, 1998, plaintiff told Dr. Holland that she could work approximately four half-days in a row with "minimal reaction."  She reported some mid-thoracic burning but less fatigue, and indicated that she could lift 10 pounds without an adverse reaction.  Dr. Holland noted that plaintiff would probably be released to light duty work by the end of the month, and on June 30, 1998, he released her to light duty work, with lifting limited to no more than 10 pounds occasionally, and limited bending.  He limited plaintiff to no more than five hours of work per day, and a maximum of 25 hours a week.

FINDINGS AND RECOMMENDATION - 4

Over the course of the next several months, plaintiff continued to complain of cervical, thoracic, and lumbosacral pain, and, in a chart noted dated September 16, 1998, Dr. Holland opined that plaintiff appeared "to be making no measurable progress." However, on October 20, 1998, Dr. Holland reported that plaintiff was capable of working 8 hours per day, 40 hours per week, with frequent breaks and an extended lunch break. Lifting was limited to 15 pounds. On November 5, 1998, plaintiff reported that she was "pushing herself" to work 8 hours a day, and Dr. Holland opined that this was "continually aggravating her condition."

In December, 1998, plaintiff began to complain of right sacroiliac pain and stiffness and leg pain in addition to the cervical and thoracic discomfort she had complained of earlier.

On January 11, 1999, plaintiff was examined by Dr. Donald Olson, a neurosurgeon specializing in pain management. Dr. Olson referred plaintiff for MRIs of the cervical and lumbar spine. These revealed degenerative disc change at the C5-6 level with small posterior osteopathic ridging, and a bulging disc and mild degenerative disc changes at the L4-5 and L5-S1 levels, and no evidence of overt neural impact.

In a visit to Dr. Holland on February 16, 1999, plaintiff reported constant dull cervical, thoracic, and lumbosacral pain, and complained of fatigue. Plaintiff stated that she had felt good for almost 3 weeks, but that pain had then returned, and that activity aggravated her condition. Plaintiff reported that part-time work was bearable, but that full-time work caused pain.

Plaintiff's husband took plaintiff to an emergency room on March 13, 1999, and reported that plaintiff was having an adverse reaction to Tylenol. Plaintiff's husband reported that plaintiff had experienced adverse reactions to Tylenol in the past. He said that plaintiff

could take only a quarter of a Tylenol tablet a day, but had taken two Tylenol the night before, and had been throwing things and yelling at him that morning.  Plaintiff was not communicative and would not make eye contact with Dr. P. Daniel Dale, the examining physician.  Dr. Dale opined that plaintiff's altered mental status was not caused by Tylenol usage, but instead involved a conversion reaction.  He reported that, when he told plaintiff that he thought the reaction might be "somewhat psychiatric-related," she became very upset and told him that she would "get an attorney and sue" him if he included that opinion in her chart.  Dr. Dale added that plaintiff's husband "picked her up and carried her out of the emergency department at that time without signing any discharge instructions."

Following an examination on April 1, 1999, Dr. Olson noted that, from a clinical standpoint, measurable nerve changes in plaintiff's leg indicated by an E.G. were "minimal in nature and . . . not a major impairment but rather a minor impairment."  He added that, though plaintiff might experience intermittent symptoms, her "functional activity using the leg" would not be curtailed.  Dr. Olson placed plaintiff on light duty restriction.

In a chart note dated May 10, 1999, Dr. Olson reported that plaintiff continued to experience sensory changes in her right leg "that seem to follow a dermatomal pattern."  He opined that electro diagnostic studies "seem to follow a dermatomal pattern" and that plaintiff's history seemed to be consistent with that pattern.

In a note dated June 24, 1999, Dr. Olson stated that plaintiff was intermittently symptomatic, and could function in a modified work situation.  Plaintiff reported that she performed mostly administrative functions, but did not work as a "regular paid employee."  Dr. Olson noted that plaintiff experienced symptoms on her right side at L5-S1, and opined that "she had stabilized with minimal, measurable impairment."  Dr. Olson stated that

plaintiff reported a sensory S1 radiculapothy, and opined that degenerative changes were more probably than not aggravated by the automobile accident, which had caused a contusion or injury to the nerve, and left plaintiff with a low grade impairment at the nerve level predominately on the right side.

In December, 1999, Dr. Olson noted that plaintiff had some weakness in her right leg. He opined that plaintiff might have an annular tear, and referred plaintiff to an accident reconstruction expert to determine whether that was possible. Plaintiff met with Michael Freeman, Ph.D., an accident reconstructionist and trauma epidemiologist, on December 30, 1999. Dr. Freeman noted that plaintiff reported pain in her low back and lumbosacral spine, which radiated into her right inguinal region and into her right thigh in the area of L2-3. Plaintiff also reported that she occasionally experienced pain in both feet when she was seated for long periods, and had begun to notice numbness in her lower left leg. She also reported generalized cervicothroacic pain without noticeable radiation into her upper extremities.

After reconstructing plaintiff's automobile accident, Dr. Feeman opined that plaintiff's low back pain was likely discogenic, resulting from a disc injury with an annular tear. He also opined that plaintiff had sustained "some degree of head injury in this crash," and observed that plaintiff had a "distinct gait abnormality, raising at least the specter of a vestibular disorder."

In a visit to Dr. Olson on January 21, 2000, plaintiff reported pain in her low back area that migrated up the thoracic area, with muscle tightening that extended to her neck. She also reported that she felt that her control of her right leg had decreased. Dr. Olson

FINDINGS AND RECOMMENDATION - 7

indicated that a "painful disc syndrome with annular tear" was "considered on a more . . . probable than not basis."

Dr. Michael Karasek, a pain specialist, examined plaintiff on February 18, 2000, to evaluate what he characterized as a "probable annular fissure at L4-5." Dr. Karasek noted that plaintiff's motor examination revealed "[f]ull tone, bulk, and power in the upper and lower extremities," and that plaintiff's gait was "[w]ithin normal limits, including tandem gait and careful testing for Romberg and other signs of gait instability." His impression was that plaintiff had an annular fissure, circumferential in type, with a high-intensity zone at L4-5. Dr. Karasek referred plaintiff to Dr. Kraig Jacobson, an allergist, to determine what material could be safely injected intradiscally to further evaluate plaintiff.

Dr. Jacobson evaluated plaintiff on March 16, 2000. Plaintiff told him that she was unable to eat many foods, was sensitive to numerous medications, and could not stop smoking because doing so would cause her health to rapidly deteriorate. She also told him that, even on 90 degree days, she needed to sit next to a heater because she is constantly cold. Dr. Jacobson noted that plaintiff was thin and anxious, had inspiratory and expiratory wheezes, and that skin testing for reaction to multiple foods was negative. He concluded that he could not document plaintiff's claims of multiple sensitivities, and that plaintiff "simply is an unacceptable risk for any type of injection because of her psychological state and personal conviction that she is indeed sensitive to everything."

On September 26, 2000, Dr. Olson testified at a trial arising from plaintiff's automobile accident. Dr. Olson testified that an enzyme inside discs can leak out through holes caused by trauma and irritate nerves. He testified that he had concluded that plaintiff had such an "annular tear," which was indicated on plaintiff's MRI. Dr. Olson testified that

there was an extremely high likelihood that plaintiff experienced a waxing and waning of symptoms with muscle spasms.  He opined that plaintiff could perform light duty work activities "without restriction," but could not lift more than 10 to 20 pounds or engage in excessive walking, standing, or sitting.  He added that plaintiff could not perform heavy labor without aggravating her condition, and that she would likely require long term pain management.

Plaintiff was evaluated by Dr. Clair Anderson, an orthopedic surgeon, on November 17, 2003.  Dr. Anderson indicated that plaintiff "markedly" restricted "all motion" because of pain complaints.  He noted marked giveway on both plaintiff's upper and lower extremities, and noted that the weakness "was so marked it was incompatible with the patient's ability to heel and toe stand, and, in fact would be incompatible with the patient's ability to walk."  Dr. Anderson diagnosed chronic spinal pain and a marked symptoms magnification syndrome, noting that plaintiff's "subjective complaints markedly outweigh the objective findings."  He added that plaintiff had "no objective findings of orthopedic or spinal abnormality," and opined that it was unlikely that plaintiff had "any significant spinal disorder, including disc disease."

A cervical x-ray taken on November 17, 2003, revealed a reversal of the usual lordotic curvature which was "compatible with muscle spasm," and disc disease at C5-6.  An x-ray of the lumbar spine revealed normal findings.

On March 23, 2004, plaintiff sought treatment for hemoptysis and an ongoing cough.  Paul Hochfeld, M.D., noted that plaintiff had "some odd presentations here which have been thought to have somewhat of psychiatric underpinning."  Dr. Hochfeld opined that plaintiff was at risk for lung cancer, and listed brochiestasis or atypical pneumonia as other

possibilities.  Because plaintiff stated that she could tolerate no antibiotics, Septra DS was prescribed.

On August 28, 2005, plaintiff sought emergency treatment for back and thigh pain. Plaintiff reported that, generally, she could be active only part of the day before needing to rest, and that her pain had worsened significantly after she had picked up a basket a few days earlier.  An MRI revealed a small central disc herniation at L4-5, and back pain with mild spinal stenosis was diagnosed.  No foraminal narrowing was observed.

Dr. Mark Wagener, a psychologist, performed a psychodiagnostic evaluation of plaintiff on November 16, 2005.  Plaintiff told Dr. Wagener that she experienced debilitating pain resulting from an annular tear at L4-5, which limited her to two and a half to three hours of productive activities a day.  Plaintiff said she had experienced two episodes of pain that prevented her from getting out of bed for at least two weeks, and that she had difficulty sleeping because she could not find a comfortable position.  Plaintiff reported that she did not use pain relievers because she had adverse reactions to medications.  She reported that, though she could read, write, perform light housework and make lunch, she could not cook dinner, do heavier housekeeping, or drive.  She said that she did not socialize.

Dr. Wagener observed that plaintiff was well oriented as to time, place, and person, had good command of spoken English, and displayed no evidence of delusions, hallucinations, or compulsions.  He found that plaintiff's concentration, as measured by serial digits, was limited, as was plaintiff's ability to verbalize abstractions.

Dr. Wagener diagnosed plaintiff with Pain Disorder associated with Both Psychological Factors and a General Medical Condition, Chronic Undifferentiated Somatoform Disorder.  Dr. Wagener opined that plaintiff's pain level would impair her

ability to sustain concentration and maintain concentration and to persist at tasks. He added that she "could be expected to engage in appropriate social interactions under limited circumstances."

In the "Medical Source Statement Of Ability To Do Work-Related Activities (Mental)" that he completed, Dr. Wagener indicated that plaintiff had no limitations in her ability to understand and remember short, simple instruction; to carry out such instructions; to understand and remember detailed instructions; or to make judgments on simple work-related decisions. He indicated that plaintiff had moderate limitations in her ability to carry out detailed instructions, and that her "focus on pain level would interfere with carrying out instructions." Dr. Wagener further indicated that plaintiff had moderate impairments in her ability to interact appropriately with the public; to respond appropriately to work pressures in a usual work setting; and to respond appropriately to changes in a routine work setting. He noted that plaintiff had "become socially withdrawn" and maintained interactions for only short periods, and that her focus of her pain would interfere with interpersonal interactions.

On December 25, 2005, plaintiff sought emergency treatment for low back pain and severe spasms that she experienced after heavy coughing. Plaintiff reported that she was extremely sensitive to many medications, and that she had taken a Demerol before arriving at the hospital. After being treated intravenously with Ativan, Demerol, and Phenegran, plaintiff's symptoms were "dramatically improved," and plaintiff was "ambulatory . . . without any significant problems." Phenegran and Ativan were prescribed, and plaintiff was released.

### **Hearing Testimony**

FINDINGS AND RECOMMENDATION - 11

1. <u>Plaintiff's Testimony</u>

       At the hearing held on April 27, 2006, plaintiff testified that she could not work because pain limited her ability to walk, sit, stand, or lie down.  She testified that, on an average day, she experienced pain that ranked as a 7 or 8 on a 10 point scale, but that she took no pain medications because they caused adverse reactions.  Plaintiff estimated that she could lift a maximum of 10 to 15 pounds.  She reported that she changed position every two and a half to three hours on a usual day, that she usually lies down 4 or 5 times a day, and that on the average she stays in bed all day about 3 days a week.  Plaintiff testified that she needed her husband's help getting in and out of the bath, and that her husband helped her dress and sometimes washed and brushed her hair.  She stated that she sometimes needed help with her hair because her arms were numb and had no strength.

       Plaintiff testified that her husband had a science research consulting business that produced no income, and that she did reading for the business when she could.  She stated that on some days she could read, and that on other days she could not.

       Plaintiff testified that she did household chores when she could.  She stated that she could make her lunch and put things in the washing machine, but could not bend down to the dryer or lift the laundry basket.  Plaintiff added that she could grocery shop for approximately 30 minutes, but could not reach items on the top or bottom shelves.

       Plaintiff testified that her condition had worsened over time following the automobile accident, and that her pain had increased and her strength had decreased.  She added that she had stopped doing certain activities as they had become increasingly difficult.

2. <u>VE's Testimony</u>

Vocational Expert (VE) Mark McGowan testified that plaintiff had past relevant work experience as an electronics assembler, a position that the VE described as light, semi-skilled.

The ALJ posed a hypothetical describing an individual of plaintiff's age, education, and experience, who could lift 10 pounds occasionally; could lift 10 pounds frequently; could sit for 6 hours, walk for 6 hours, or stand for 6 hours during an 8-hour work day; required the option to sit or stand for comfort at will; could perform simple, repetitive tasks of one to three steps; could reach overhead only occasionally; should never climb ladders, ropes or scaffolds; could occasionally stoop, crouch, and crawl; could frequently balance and kneel; should not be required to follow a strict production pace; and who should have no public contact.

The VE testified that the described individual could not perform any of plaintiff's past work or any other jobs.  When the ALJ asked if eliminating the "no strict production pace" restriction changed the VE's answer, the VE responded that the individual described could work as a small products assembler, a marker, or as an electronics worker.  In response to further questioning by the ALJ, the VE testified that a person who needed to lie down 5 times a day for 30 to 60 minutes at a time, could lift no more than 10 pounds, and would miss an average of 3 days a week of work could not perform any work.

**Disability Analysis**

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act.  20 C.F.R. §§ 404.1520, 416.920.  Below is a

summary of the five steps, which also are described in <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

     <u>Step One</u>.  The Commissioner determines whether the claimant is engaged in substantial gainful activity (SGA).  A claimant engaged in such activity is not disabled.  If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to evaluate the claimant's case under Step Two.  20 C.F.R. § 404.1520(b).

     <u>Step Two</u>.  The Commissioner determines whether the claimant has one or more severe impairments.  A claimant who does not have such an impairment is not disabled.  If the claimant has a severe impairment, the Commissioner proceeds to evaluate claimant's case under Step Three.  20 C.F.R. § 404.1520(c).

     <u>Step Three</u>.  Disability cannot be based solely on a severe impairment; therefore, the Commissioner next determines whether the claimant's impairment "meets or equals" one of the impairments listed in the SSA regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1.  A claimant who has such an impairment is disabled.  If the claimant's impairment does not meet or equal one listed in the regulations, the Commissioner's evaluation of the claimant's case proceeds under Step Four.  20 C.F.R. § 404.1520(d).

     <u>Step Four</u>.  The Commissioner determines whether the  claimant is able to perform work he or she has done in the past.  A claimant who can perform past relevant work is not disabled.  If the claimant demonstrates he or she cannot do work performed in the past, the Commissioner's evaluation of the claimant's case proceeds under Step Five.  20 C.F.R. § 404.1520(e).

     <u>Step Five</u>.  The Commissioner determines whether the claimant is able to do any other work.  A claimant who cannot perform other work is disabled.  If the Commissioner

FINDINGS AND RECOMMENDATION - 14

finds that the claimant is able to do other work, the Commissioner must show that a significant number of jobs exist in the national economy that the claimant can do. The Commissioner may satisfy this burden through the testimony of a vocational expert (VE) or by reference to the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2. If the Commissioner demonstrates that a significant number of jobs exist in the national economy that the claimant can do, the claimant is not disabled. If the Commissioner does not meet this burden, the claimant is disabled. 20 C.F.R. § 404.1520(f)(1).

At Steps One through Four, the burden of proof is on the claimant. Tackett, 180 F.3d at 1098. At Step Five, the burden shifts to the Commissioner to show that the claimant can perform jobs that exist in significant numbers in the national economy. Id.

## ALJ'S Decision

The ALJ found that plaintiff met the insured status requirements of the Social Security Act through December 31, 2002, and that she had not engaged in substantial gainful activity since the alleged onset of her disability on October 9, 1997.

The ALJ next found that plaintiff's chronic low back pain and degenerative disc disease of the cervical spine were "severe impairments" within the meaning of the Act. She noted that plaintiff had "documented cervical osteoarthritis at C6 and evidence of a small disc herniation with possible annular tear at L4-5." The ALJ noted that Dr. Olson had opined that, as of June 24, 1999, plaintiff was "stable with no measurable impairment," and that plaintiff could perform light work.

The ALJ next found that plaintiff had the residual functional capacity needed to perform simple, repetitive 1-3 step tasks at a light exertional level; could occasionally lift 20

pounds and could frequently lift 10 pounds; could stand and/or walk for six hours and sit for

six hours during an eight-hour work day; needed a sit/stand option to relieve discomfort;

could reach overhead, stoop, crouch, crawl, or climb ramps and stairs only occasionally;

should avoid frequent balancing or kneeling; could never climb ladders, ropes, or scaffolds;

and should have no contact with the general public.  Citing the VE's testimony, the ALJ

found that plaintiff was unable to perform her past relevant work, but retained the functional

capacity required to work as a small products assembler, marker, or electronics worker.

Accordingly, she found that plaintiff was not disabled within the meaning of the Act.

In reaching her conclusion that plaintiff was not disabled, the ALJ found that

plaintiff's description of "the intensity, persistence and limiting effects of her symptoms are

not entirely credible."

## Standard of Review

A claimant is disabled if he or she is unable "to engage in substantial gainful activity

by reason of any medically determinable physical or mental impairment which . . . has lasted

or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C.

§ 423(d)(1)(A).  The initial burden of proof rests upon the claimant to establish his or her

disability.  Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122

(1996).  The Commissioner bears the burden of developing the record.  DeLorme v. Sullivan,

924 F.2d 841, 849 (9th Cir. 1991).

The district court must affirm the Commissioner's decision if it is based on proper

legal standards and the findings are supported by substantial evidence in the record as a

whole.  42 U.S.C. § 405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).

"Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews, 53 F.3d at 1039. The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986). The Commissioner's decision must be upheld, however, even if "the evidence is susceptible to more than one rational interpretation." Andrews, 53 F.3d at 1039-40.

## Discussion

Plaintiff contends that the ALJ erred in failing to find that certain impairments cited by Dr. Wagener were "severe," and in failing to provide clear and convincing reasons for concluding that plaintiff was not wholly credible.

### 1. ALJ's evaluation of plaintiff's impairments

In her opinion denying plaintiff's application for benefits, the ALJ noted that she had referred plaintiff for a psychological assessment because she suspected that plaintiff had a conversion disorder.[1] As noted above, Dr. Wagener, who performed the psychological evaluation, diagnosed plaintiff with "Pain Disorder associated with Both Psychological Factors and a General Medical Condition, Chronic Undifferentiated Somatoform Disorder," and opined that plaintiff's level of pain would impair her ability to sustain concentration and maintain concentration needed to persist at tasks. He further opined that plaintiff had no limitations in her ability to understand and remember short, simple instructions; to carry out

---

[1]The term "conversion disorder" refers to somatic symptoms traditionally thought to represent an individual's symbolic resolution of an unconscious psychological conflict. See Diagnostic and Statistical Manual of Mental Disorders, 4th Ed., p. 452-454.

FINDINGS AND RECOMMENDATION - 17

such instructions; to understand and remember detailed instructions; or to make judgments on simple work-related decisions; but that she had moderate limitations in her ability to carry out detailed instructions, and that her "focus on pain level would interfere with carrying out instructions."  He added that plaintiff had moderate impairments in her ability to interact appropriately with the public, ability to respond appropriately to work pressures in a usual work setting, and ability to respond appropriately to changes in a routine work setting.

Plaintiff correctly notes that the ALJ did not specifically find that the pain disorder that Dr. Wagener diagnosed was a "severe" impairment at step two of the disability analysis, and also correctly notes that an impairment is severe if it has more than a minimal effect on an individual's ability to work.  See SSR 85-28, Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir. 1988).  Dr. Wagener's diagnosis of a pain disorder which caused moderate impairments in plaintiff's ability to sustain concentration needed to persist at tasks was not contradicted by other medical opinion in the record, and the ALJ did not provide any reasons for failing to credit that diagnosis.  Accordingly, the ALJ erred in failing to consider plaintiff's pain disorder as "severe."  See, e.g., Widmark v. Barnhart, 454 F.3d 1063, 1066 (9th Cir. 2006) (uncontradicted opinion of examining doctor can be rejected only by clear and convincing reasons).

The Commissioner does not explicitly disagree with plaintiff's contention that the ALJ erred in failing to identify plaintiff's pain disorder as a "severe" impairment, but contends that "any error committed by the ALJ in not finding Plaintiff's mental impairment severe was made harmless by the residual functional capacity findings."  The Commissioner contends that "the ALJ properly accounted" for the impairments that Dr. Wagener had identified "by limiting Plaintiff to unskilled work that involved simple, repetitive 1-to-3 step

work tasks." The Commissioner asserts that these limitations "are also consistent with Dr. Wagener's opinion that Plaintiff was capable of understanding, remembering, and carrying out simple instructions and engaging in appropriate social interactions under limited circumstances, for example with co-workers and supervisors."

I disagree with the Commissioner's assertions that the failure to find plaintiff's mental impairment was not severe was at most harmless error, and that the ALJ's residual functional capacity analysis included all the limitations indicated by Dr. Wagener's uncontradicted assessment. In limiting plaintiff to "simple, repetitive 1-3 step tasks" and eliminating contact with the general public, the ALJ did not account for the moderate limitation in plaintiff's ability to respond appropriately to work pressures and to changes in a routine work setting, and for the impairment in ability to maintain concentration needed to persist at tasks that Dr. Wagener indicated. In light of the VE's testimony, I cannot conclude that the failure to address these impairments was harmless error: In response to the ALJ's first hypothetical, the VE testified that the inability to adhere to a strict production pace would rule out all work. The VE testified that plaintiff could perform certain jobs only after the ALJ subsequently eliminated the "no strict production pace" restriction.

In order to be accurate, an ALJ's hypothetical to a VE must set out all of the claimant's impairments. E.g., Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984) (citing Baugus v. Secretary of Health & Human Services, 717 F.2d 443, 447 (8th Cir. 1983)). The ALJ's depiction of the claimant's limitations must be "accurate, detailed, and supported by the medical record." Tackett v. Apfel, 180 F.3d 1094, 1101 (9th Cir. 1999). If the assumptions in the hypothetical are not supported by the record, a VE's opinion that a claimant can work does not have evidentiary value. Gallant, 753 F.3d at 1456.

FINDINGS AND RECOMMENDATION - 19

Here, the ALJ's hypothetical did not include the impairments in ability to maintain concentration needed to persist at tasks and ability to respond appropriately to work pressures indicated in Dr. Wagener's uncontradicted assessment.  In the absence of any reference to such impairments in the ALJ's hypothetical, and any testimony from the VE concerning the effects of such impairments on the ability to perform the jobs cited, it is not clear that merely restricting plaintiff to "simple, repetitive" tasks accounts for the effect of those limitations on the ability to perform at a satisfactory pace.  It is not clear that the "simple, repetitive" tasks to which the ALJ limited plaintiff could be performed at an acceptable pace by an individual whose concentration and ability to respond to workplace stress was limited as indicated by Dr. Wagener's report.

Plaintiff contends that the ALJ's failure to consider her pain disorder as "severe" and failure to include that limitation in the residual functional capacity evaluation require this action to be remanded for an award of benefits or for further proceedings.  Whether an action is remanded for an award of benefits or for further proceedings depends on the likely utility of additional proceedings.  Harman v. Apfel, 211 F.3d 1172, 1179 (9th Cir. 2000).  Remand for an award of benefits is appropriate only if there are no outstanding issues to be resolved before a determination of disability can be made.  See, e.g., Smolen v. Chater, 80 F.3d 1273, 1292 (9th Cir. 1996).

Here, the action should be remanded for further proceedings because the record does not establish whether or not a person with plaintiff's mental impairments could maintain the pace required to perform the work the ALJ identified or any other jobs that exist in substantial numbers in the national economy.  On remand, an ALJ should include the limitations indicated by Dr. Wagener in the assessment of plaintiff's residual functional

capacity, and should ask a VE whether an individual with those limitations could perform the jobs identified or any other work.


2.  Credibility Assessment

An ALJ is responsible for determining credibility.  Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).  If a plaintiff produces medical evidence of an underlying impairment, the ALJ may not discredit the claimant's testimony concerning the severity of symptoms merely because it is unsupported by objective medical evidence.  Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998) citing Bunnell v. Sullivan, 947 F.2d 341, 343 (9th Cir. 1990) (en banc).  Unless there is affirmative evidence that the claimant is malingering, the ALJ must provide "clear and convincing" reasons for rejecting the claimant's testimony. Id., quoting Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995).

In evaluating a claimant's credibility, the ALJ may consider: (1) ordinary methods of credibility evaluation, including the claimant's reputation for veracity, prior inconsistent statements concerning symptoms, and other testimony by the claimant that reflects upon the claimant's credibility; (2) unexplained or inadequately explained failure to seek treatment or follow a course of treatment prescribed; (3) the claimant's daily activities; (4) objective medical evidence; (5) opinions from medical sources; (6) the location, duration, frequency, and intensity of symptoms; (7) precipitating and aggravating factors; (8) the type, dosage, effectiveness, and side effects of medications; (9) treatment other than medication; and (10) statements from the claimant and others regarding the claimant's symptoms and limitations. 20 C.F.R. § 404.1529(c); Smolen v. Chater, 80 F.3d 1273, 1284-85 (9th Cir. 1996).

In reaching her conclusion that plaintiff was not disabled, the ALJ found that plaintiff's "statements concerning the intensity, persistence and limiting effects of her symptoms are not entirely credible."  She added that "the objective evidence does not fully support the extent of Ms. Watkin's alleged limitations, but documents instead her exaggeration as well as unreliable reporting on her part."  In support of this conclusion, the ALJ cited the inconsistency between plaintiff's allegations of serious, wide-ranging food and drug allergies and the results of objective allergy testing, which disclosed no objective evidence of sensitivities to any substances.  The ALJ noted that, during a consultative examination, plaintiff had alleged "give away weakness so extreme" that Dr. Anderson had deemed it "to be incompatible with the ability to walk," and had "displayed extreme symptom magnification behavior including positive Waddell's tests . . . ."  She also noted that, though plaintiff had told a doctor that she had suffered a precipitous drop in blood pressure and required oxygen after receiving Phenergan, Demerol, and Ativan to relieve back pain, medical records of the incident in question did not indicate any drop in blood pressure or use of oxygen, but instead reported that plaintiff slept, then went outside to smoke a cigarette, and was discharged to home care.  She also noted that plaintiff repeatedly threatened to sue doctors with whom she disagreed, and asserted that plaintiff's "resort to threats and bullying to make her case . . .[did] not enhance her credibility."

Because medical evidence indicated the existence of an underlying impairment and there was not evidence that plaintiff was malingering, the ALJ was required to cite clear and convincing evidence supporting her conclusion that plaintiff was not wholly credible.  The evidence cited by the ALJ satisfied that requirement.  Accordingly, if my recommendation

that this action be remanded for further proceedings is adopted, the credibility issue should not be subject to further inquiry.

## Conclusion

For the reasons set out above, a judgment should be entered remanding this action for further proceedings.  On remand, an ALJ should include the impairments to concentration and ability to respond to work stresses and routine changes in the routine work setting indicated by Dr. Wagener in the assessment of plaintiff's residual functional capacity, and should ask a VE whether an individual with those limitations could perform the jobs that the ALJ found she could perform or any other work.

## Scheduling Order

The above Findings and Recommendation are referred to a United States District Judge for review.  Objections, if any, are due September  4, 2008.  If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

A party may respond to another party's objections within 10 days after service of a copy of the objection.  If objections are filed, review of the Findings and Recommendation will go under advisement upon receipt of the response, or the latest date for filing a response.

DATED this 19th day of  August, 2008.


/s/  John Jelderks_____
John Jelderks
U.S. Magistrate Judge


FINDINGS AND RECOMMENDATION - 23